UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES FOX #458647, et al.,

    Plaintiffs,

v.

HEIDI WASHINGTON,

    Defendant.

_____/

Hon. Phillip J. Green

Case No. 1:13-cv-01003-PJG

## MEMORANDUM OPINION

This is a civil rights action brought by two state prisoners pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq*. Plaintiffs are prisoners James Fox and Scott Perreault. This lawsuit arises out of conditions of their confinement. When this action was filed, both plaintiffs were held at the Richard A. Handlon Correctional Facility. Currently, James Fox is a prisoner at Muskegon Correctional Facility and Scott Perreault is confined at Lakeland Correctional Facility. By Stipulation, plaintiffs have substituted current Michigan Department of Corrections (MDOC) Director Heidi Washington in place of former defendant MDOC Director Daniel Heyns. The parties have also stipulated to the dismissal without prejudice of claims against defendants Cathleen Stoddard, Shawn Young, and David Leslie. (ECF No. 111).

Plaintiffs challenge the denial of their request to have the Christian Identity faith – their faith – recognized. (Amend. Compl., ECF No. 15). Specifically, they allege that defendant has violated the Free Exercise Clause of the First Amendment and RLUIPA by: (1) denying them communal worship; (2) denying them full-body immersion baptism; and (3) denying them the ability to celebrate seven religious holidays that are recognized by the Christian Identity faith. (*Id.*, PageID.44). Plaintiffs are seeking injunctive relief requiring that the MDOC recognize the Christian Identity faith.

On August 13, 2018, this Court conducted a bench trial. Plaintiffs filed a post-trial brief on October 15, 2018 (ECF No. 145), and defendant filed her post-trial brief on November 20, 2018. (ECF No. 150). As articulated herein, the Court finds for defendant on both of plaintiffs' claims.

## **Discussion**

Plaintiffs assert that the Christian Identity faith requires them to participate in communal worship with racial separatism, to be baptized by full body immersion, and to observe certain religious holy days. (*See* Pltfs' Br. at 20-21, ECF No. 145, PageID.1544-45 (citing Trial Tr., ECF No. 141, PageID.1156-57, 1166, 1168, 1169, 1214)). Plaintiffs complain that the lack of recognition precludes them from conducting religious services as proscribed by the Christian Identity faith, including their practice of excluding non-whites. (*See* Pltfs' Br. at 21, 23, PageID.1545, 1547).

Defendant counters that plaintiffs' request for the recognition of the Christian Identity faith was denied for two reasons: (1) that "the religious beliefs and practices

2

of the Christian Identity religion can be adequately met by an existing recognized religious group"; and (2) that it would "threat[en] . . . the custody and security at all correctional facilities." (Trial Exh. A, Aug. 3, 2017, MDOC Memorandum; K. McKee, Trial Tr. at 99-102, ECF No. 141, PageID.1235-38; D. Leach, Trial Tr. at 118-19, PageID.1254-55).[1] The decision regarding the adequacy of an existing religious group was based on the recommendation of the Chaplaincy Advisory Council,[2] which opined that "many core religious beliefs of the Christian Identity religion are similar to those of other Christian religious groups recognized by the MDOC." (Trial Exh. A).

## I. Plaintiffs' First Amendment Claims

The Supreme Court has observed that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also, Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Thus, while "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates

---

[1] MDOC Deputy Director Kenneth McKee was the decisionmaker. His August 7, 2017, handwritten note explaining his decision merely states: "I approve that the recognition of this Christian Identity Religious group be denied due to the threat to the custody and security at all correctional facilities." (Trial Exh. A). Plaintiffs conceded at the beginning of trial that MDOC had preserved both bases for denial of plaintiffs' request for recognition of the Christian Identity faith. (*See* Trial Tr. at 12-13, ECF No. 141, PageID.1148-49).

[2] The Chaplaincy Advisory Council consists of members from various religious organizations representing different belief systems. It provides advice and recommendations to the MDOC concerning religious issues. (D. Leach, Trial Tr. at 114, ECF No. 141, PageID.1250).

nevertheless retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). But "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Wolfish*, 441 U.S. at 545. After all, operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

Accordingly, courts have consistently held that issues involving "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Wolfish*, 441 U.S. at 547); *see also, Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (issues involving prison administration are properly resolved by prison officials, and the solutions at which they arrive should be accorded deference).

When reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights. *See Turner*, 482 U.S. at 85. The standard by which this balancing occurs was articulated by the *Turner* Court, which held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 89. This standard represents a "reasonableness test less restrictive than that ordinarily applied to

4

alleged infringements of fundamental constitutional rights." *Flagner*, 241 F.3d at 481 (quoting *Shabazz*, 482 U.S. at 349). The *Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison regulation:

(1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

(2) whether there are alternative means of exercising the right that remain open to prison inmates;

(3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

(4) whether there are ready alternatives available that fully accommodate the prisoner's rights at a *de minimus* cost to valid penological interests.

*Turner*, 482 U.S. at 89-91.

Failure to satisfy the first factor renders the regulation unconstitutional, without regard to the remaining three factors. *Id.* at 89-90. If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484. The *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91. Instead, the issue is simply

5

whether the policy at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484.

With respect to which party bears the burden concerning the *Turner* analysis, the Supreme Court has held that "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This places on the prisoner the burden as to the last three *Turner* factors, but says nothing as to which party bears the burden as to the initial factor. As subsequent courts have concluded, the burden to articulate the rationale for a challenged action must rest with prison officials. As the Sixth Circuit observed: "Defendants must still articulate their interest in the regulation . . . . Otherwise, a prisoner would be forced to hypothesize any number of potential legitimate penological interests and then disprove a reasonable relationship between each and the regulation at issue." *Figel v. Overton*, 121 Fed. Appx. 642, 646 n.2 (6th Cir., Feb. 4, 2005) (internal citations omitted); *see also*, *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012) ("the prison has the burden of demonstrating the First *Turner* Factor").

Accordingly, the Court concludes that, with respect to the *Turner* factors, defendant bears the initial burden to articulate a valid, rational connection between the challenged action and the legitimate governmental interest that motivated it. This burden is "slight, and in certain instances, the connection may be a matter of common sense." *Johnson*, 669 F.3d at 156.

David Leach is the MDOC's Special Activities Coordinator. His responsibilities include making recommendations regarding the recognition of religious groups. He made the recommendation to deny plaintiffs' request for the recognition of the Christian Identity faith, based in part on the opinion of the Chaplaincy Advisory Council. Mr. Leach testified that MDOC facilities have limited space and resources to accommodate religious groups. Accordingly, it is MDOC's policy to combine generally compatible religious groups – those that share "core or primary beliefs" – for communal worship services. (D. Leach, Trial Tr. at 111, 115-18, ECF No. 141, PageID.1247, 1251-54).

MDOC Deputy Director Kenneth McKee has responsibility for overseeing the state's thirty prisons, including the maintenance of custody and security within each prison facility. He made the decision on August 7, 2017, to deny plaintiffs' request for the recognition of the Christian Identity faith, which decision was based on Mr. Leach's recommendations outlined in his memorandum of August 3, 2017. Mr. McKee testified that the benefit of the MDOC's recognition of a religious group is the ability to meet as a group on a weekly basis. Those who adhere to unrecognized faiths are generally not otherwise prohibited from worshiping as they choose. (McKee, Trial Tr. at 97-100, ECF No. 141, PageID.1233-36; Trial Exh. A).

Mr. McKee deferred to the opinion of the Chaplaincy Advisory Board in determining that the beliefs of Christian Identify faith could adequately be addressed through other recognized religious groups, noting the expertise of the council in such matters. As to the second reason for denying recognition of the Christian Identity

7

faith – racial violence – he noted that, "[i]n prison, custody and security [are] first and foremost." (*Id.* at 101-02, 104, PageID.1237-38, 1240).

The MDOC has stated two significant institutional interests being served by its decision to deny recognition of the Christian Identity faith: (1) limited space and resources for accommodating communal worship services; and (2) custody and security concerns relating to the potential for racial violence. Plaintiffs do not appear to challenge the validity of the space and resource concerns of the MDOC – at least they have offered no evidence to challenge it. Plaintiffs affirmatively concede the legitimacy of the penological interest in the safety and security of correctional facilities. (Pltfs' Trial Br. at 17, ECF No. 145, PageID.1541). Instead, plaintiffs argue that the MDOC's concerns for racial violence is so lacking in factual foundation as to render its decision arbitrary and capricious. (*Id.*). The Court disagrees.

Mr. Leach testified that he conducted internet research on the Christian Identity faith. He found a number of articles and reports relating to racial violence associated with that religion. These included a 1999 FBI report, a 2016 Newsweek article, and a 1998 study conducted by the Southern Poverty Law Center, all of which recounted violent acts committed by adherents of the Christian Identity faith. Mr. Leach testified that he found nothing throughout his research to suggest that the Christian Identity faith was no longer aligned with racial violence. (Leach, Trial Tr. at 120-22, ECF No. 141, PageID.1256-58).

Plaintiffs acknowledged that the Christian Identity faith commands racial separatism. They testified that this command is biblically based, and it prohibits

8

them from marrying and worshiping with non-white persons. They further testified, however, that this racial separatism was different than racism, and that their faith taught non-violence. (Perreault, Trial Tr. at 35-39, ECF No. 141, PageID.1171-75; Fox, Trial Tr. at 73-74, PageID.1209-10). Plaintiffs offered a document written by a Christian Identity pastor that included the following statement: "We do teach that the white people are the Israelites of the Bible and are called to be the servant people of God. In this capacity they built the churches, translated the Bible, clothed the world and provided food. We do teach white separatism." (Trial Exh. 20, ¶ 5). Mr. Perreault acknowledged that racial separatism was "a large component of the Christian Identity faith." (Perreault, Trial Tr. at 55-56, PageID.1191-92).

Plaintiffs' contention that they hold no animus toward non-white persons, and that they have no hostile or violent intentions toward them, does not negate the MDOC's legitimate concerns regarding the safety and security of all prisoners and prison staff. Even if plaintiffs (and other potential Christian Identity adherents) never engage in acts of violence, formal recognition of a religion that preaches racial separatism creates a significant, inherent risk that violence will occur. This risk is heightened by the fact that Christian Identity faith does not simply preach that races should be separated, but that the white people are the only true descendants of the Israelites: the chosen people of God. This is a form of white supremacy.

Other prisoners – particularly those of color – are likely to be offended by this religious tenet. It would not be unexpected, then, that the offense taken may be sufficiently great that it would result in acts of violence against the members of the

9

Christian Identity faith. Common sense provides a sufficient basis to find a rational connection between the recognition of a white-supremacist religion and concerns about maintaining custody and security within its prisons. *Cf. Johnson*, 669 F.3d at 156 (The burden to articulate a valid, rational connection between the challenged action and the legitimate governmental interest motivating it is "slight, and in certain instances, the connection may be a matter of common sense."); *see also Berryman v. Granholm*, 343 Fed. Appx. 1, 6 (6th Cir., Aug. 12, 2009) (noting that it is well recognized that prison officials have a legitimate interest in "maintaining discipline within the prison.").

In sum, defendant has established that there exists a valid, rational connection between the MDOC's decision not to recognize the Christian Identity faith and the legitimate governmental interests put forward to justify that decision.

The Court will examine the remaining three *Turner* factors together. That is, whether plaintiffs have alternative means of practicing their faith; what impact recognition of the Christian Identity faith would have on prison guards and other inmates, as well as the allocation of prison resources; and whether there are ready alternative means of fully accommodating plaintiffs' stated religious needs at a *de minimus* cost to the MDOC's penological interests. *Turner*, 482 U.S. at 89-91. Plaintiffs bear the burden of demonstrating under these factors that the MDOC's decision not to recognize the Christian Identity faith was unreasonable. *See Overton*, 539 U.S. 126, 132 (2003).

Plaintiffs have failed to meet their burden here, as every factor militates in favor of the MDOC's decision. As noted above, there is no way to formally recognize the Christian Identity faith without creating an inherent risk of violence within the prison population. Moreover, as MDOC Deputy Director McKee noted, the import of the lack of formal recognition is simply that Christian Identity adherents cannot meet for group worship. Plaintiffs are not otherwise deprived of the ability to practice their faith.

The Christian Identity faith recognizes seven religious holy days: Passover, the Feast of Unleavened Bread, Pentecost, Trumpets, the Day of Atonement, the Feast of Tabernacles, and the Last Great Day. (Perreault, Trial Tr. at 24, ECF No. 141, PageID.1160). Mr. Perreault testified that the Seventh Day Adventist denomination – an MDOC-recognized faith – observes these holy days. But he contended that he cannot celebrate the holy days with them because the Seventh Day Adventists recognize a Saturday sabbath, while the Christian Identity faith celebrates the sabbath on Sundays. (*Id.* at 25-31, PageID.1161-67). He failed to explain, however, how the sabbath distinction necessarily precludes him from joining with another denomination in the celebration of a holy day.[3] In other words, he does not cite to any tenet of the Christian Identity faith that affirmatively forbids him from

---

[3] Mr. Perreault noted that the Christian Identity faith calculates its holy days using a solar calendar, and that "the others use a lunar calendar." (Perreault, Trial Tr. at 29, ECF No. 141, PageID.1165). He did not specify whether the Seventh Day Adventists are among "the others"; nor does he explain how the use of the different calendars preclude the joint celebration of the seven holy days.

11

celebrating a holy day with the Seventh Day Adventists, other than the fact that the Seventh Day Adventists are not racial separatists.

Plaintiffs have failed to demonstrate how the non-recognition of their faith precludes them from individually observing the holy days. To the extent they need a special diet for such celebrations, that issue is not properly before the Court. Their complaint regarding the celebration of the holy days primarily centers on their interests in celebrating them communally. That presents a serious impediment, of course, because the Christian Identity adherents restrict their services to whites only, which implicates the MDOC's heightened interest in protecting the safety of its prisoners and guards.

Lastly, plaintiffs cannot show that the non-recognition of the Christian Identity faith is the cause of their lack of access to total immersion baptism.[4] To the contrary, such recognition is not required to obtain permission for this form of baptism. (*See* Leach, Trial Tr. at 123-24, ECF No. 141, PageID.1259-60). Both plaintiffs have acknowledged that the MDOC previously granted their respective requests for total immersion baptism while they were incarcerated at the Chippewa Correctional Facility. (Perreault, Trial Tr. at 34, PageID.1170; Fox, Trial Tr. at 88, 93, PageID.1224, 1229). Unfortunately, plaintiffs were transferred to a downstate

---

[4] Mr. Perreault acknowledged that he had been a member of the Christian Identity faith for approximately thirteen years before he entered prison, and that he had not requested baptism during that period. (Perreault, Trial Tr. at 45-46, ECF No. 141, PageID.1181-82).

12

prison to attend a court date in this case before the baptisms could be performed. (Perreault, Trial Tr. at 34, PageID.1170).

In conclusion, defendant has established that there exists a valid, rational connection between the MDOC's decision not to recognize the Christian Identity faith and its legitimate interests in preserving limited resources and in maintaining the security of its prisons. *Cf. Bruton v. McGinnis*, 110 F.3d 63, 1991 WL 139797 (6th Cir. 1997) (unpublished) (upholding the validity of MDOC restrictions against Christian Identity religious materials and services, noting MDOC's limited ability to accommodate every religious group, the reasonableness of providing adequate "generic" religious services, and the risk of violence resulting from the white-supremacist tenets of the religion). Plaintiffs have failed to meet their burden of demonstrating that the decision not to recognize the Christian Identity faith is otherwise unreasonable. Accordingly, the Court finds for defendant on plaintiffs' First Amendment claim.

## II. Plaintiffs' RLUIPA Claim

RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The statute does not define the term "substantial burden." Moreover, neither the Supreme Court nor the Sixth Circuit appears to have precisely defined the term, at least within the institutionalized-persons context. The Supreme Court came close in *Holt v. Hobbs*, holding that a prison grooming policy limiting beard-growth to a half

inch placed a substantial burden on a Muslim prisoner's exercise of his religion, as it required him "to 'engage in conduct that seriously violates [his] religious beliefs.' " __ U.S. __, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, 134 S. Ct 2751, __ (2014)). But the *Holt* decision did not define substantial burden. Rather, it "explained that the ability to engage in other religious practices did not prevent a prisoner from making a substantial-burden claim as to the rule against growing a half-inch beard." *Livingston Christian Schools v. Genoa Charter Township*, 858 F.3d 996, 1001-02 (6th Cir. 2017).

In *Livingston Christian Schools*, the Sixth Circuit addressed the question of substantial burden within the context of land-use restrictions. *See* 858 F.3d at 998. The context matters, as there are significant differences between the burdens placed on religious institutions through land-use restrictions and the burdens prison policies place on the exercise of prisoners' religious beliefs. *See id.* at 1003-04 ("Other circuits have persuasively explained that land-use restrictions do not typically compel plaintiffs to 'violate their beliefs' in the way that, for example, prison rules might require an inmate to engage in conduct that goes against his or her religious tenets." (citations omitted)). The Sixth Circuit noted, however, that "a burden must have some degree of severity to be considered 'substantial.' " *Id.* at 1003 (citing *Int'l Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011) (explaining that substantial burden "must impose a significantly great restriction or onus upon [religious] exercise" (internal citation omitted)); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (concluding

14

that a substantial burden is "more than inconvenience")). That a substantial burden would involve some degree of severity is a principle that would apply to prisoners as well as religious institutions.

Both parties in this case rely on the analysis of substantial burden in an unpublished decision, *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. App'x 729 (6th Cir. 2007). (*See* Pltfs' Br. at 19, ECF No. 145, PageID.1543; Def's Br. at 8, ECF No. 150, PageID.1617). Like *Livingston Christian Schools*, the *Living Water* decision involved a RLUIPA challenge to a land-use restriction. In *Living Water*, the Sixth Circuit declined to establish a "bright line test," opting instead for a "framework" by which the facts of the case could be analyzed in the land-use restriction context. 258 Fed. Appx at 737. That framework came under some criticism in the *Livingston Christian Schools* decision, *see* 858 F.3d at 1003; moreover, it is not particularly helpful here.

Instead, the parties rely on dicta from the *Living Water* decision for a working definition of substantial burden. In that dicta, the Sixth Circuit indicated that the term "substantial burden" should be analyzed under Supreme Court precedent in the "Free Exercise" context, noting the "hurdle is high and that determining its existence is fact intensive." *Living Water*, 258 Fed. Appx at 733-34. The court noted, among other things, that "the Supreme Court generally has found that a government's action constituted a substantial burden on an individual's free exercise of religion when . . . the action in question placed 'substantial pressure on an adherent to modify his behavior and to violate his beliefs'." *Id.* at 734 (quoting *Thomas v. Review Bd. of*

15

*Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)). The Sixth Circuit also noted that the Supreme Court "has found no substantial burden when, although the action encumbered the practice of religion, it did not pressure the individual to violate his or her religious beliefs." *Living Water*, 258 Fed. Appx at 734 (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988); *Braunfeld v. Brown*, 366 U.S. 599, 605-06 (1961)). These principles are consistent with decisions from other courts of appeal that have addressed the definition of "substantial burden." *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (" 'substantial pressure on an adherent to modify his behavior and to violate his beliefs' " (quoting *Thomas*, 450 U.S. at 718)); *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (a burden that "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs"); *Midrash Sephardi*, 366 F.3d at 1227 ("result[ing] from pressure that tends to force adherents to forego religious precepts or . . . [tends to] mandate [ ] religious conduct"); *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) ("a significantly great restriction or onus upon [religious] exercise"); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("[a burden] that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable"); *see also Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).

This Court adopts the principles outlined above in analyzing the burden the MDOC's decision not to recognize the Christian Identity faith has on plaintiffs' exercise of their religious faith. Plaintiffs bear the burden to establish that their ability to exercise their religious beliefs has been substantially burdened. 42 U.S.C. § 2000cc-2(b); *Holt v. Hobbs*, 135 S. Ct. at 862.

On the record before this Court, plaintiffs have failed to meet their burden of establishing that the non-recognition of the Christian Identity faith substantially burdens their exercise of that religion. This is true with respect to each of plaintiffs' stated need for communal worship, the celebration of the seven holy days, and total immersion baptism.

Neither plaintiff has identified another member of the Christian Identity faith who is currently housed in the same facility. Mr. Perreault resides at the Lakeland Correctional Facility, while Mr. Fox is an inmate at the Muskegon Correctional Facility. Even when they were housed in the same facility, at the time they filed their amended complaint, they did not allege the presence of other members of the Christian Identity faith, let alone have they offered anything to suggest that other inmates were interested in communal services. (*See* Amend. Compl., ECF No. 15).

Moreover, neither plaintiff has provided any specifics regarding the need for weekly communal services, much less have they provided an explanation of the rites associated with those services. When asked for the basis of his requirement to attend communal services, Mr. Perreault cited simply to the Fourth Commandment's requirement to honor the sabbath, and Jesus Christ's declaration that, "where two or

17

more are gathered in His name, there He is among you." He explained that the services would last approximately 120 minutes, and that the benefit of communal worship is "protection for the body and the family of believers against the attacks of the devil." (Perreault, Trial Tr. at 32-33, ECF No. 141, PageID.1168-69). Mr. Perreault offers no specific dogma of the Christian Identity faith to support his stated need for communal worship.

Similarly, Mr. Fox cited as the basis for his need for communal worship only his spiritual edification and some undefined biblical command. He testified simply that the lack of communal worship "takes away from [his] connection to fellow believers as well as God." Mr. Fox also cited to a letter from a Christian Identity pastor – one whose directions he would follow concerning the practice of the faith – in which the pastor stated: " 'It is very necessary for anyone associated with the Church of Israel to be in compliance with the dietary requirements, baptism by immersion, observance of the Biblical sabbath and holy days, as well as other Biblical requirements.' " (Fox, Trial Tr. at 76-78, 80-81, ECF No. 141, PageID.1212-14, 1216-17).[5]

None of the evidence plaintiffs have proffered suffices to meet the particularized and relatively heavy burden of proving that the lack of communal worship creates substantial pressure to violate their religious beliefs. *Cf. Living Water*, 258 Fed. Appx at 733-34. This is not to say that plaintiffs' stated interests in

---

[5] The Christian Identity faith is also known as the Church of Israel. (*See* Perreault, Trial Tr. at 36-37, ECF No. 141, PageID.1172-73).

attending communal services under the Christian Identity faith are insincere. Their testimony is simply insufficient to prove that the specific requirements for communal services are sufficiently unique to require recognition separate from other Protestant denominations. *See Small v. Lehman*, 98 F.3d 762, 767 (3d Cir. 1996) ("The State does not have an affirmative duty to provide every prison inmate with . . . the [religious] service of his choice."), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).

In *Mann v. Wilkinson*, the Southern District of Ohio granted summary judgment against a similar RLUIPA claim brought by a Christian Identity prisoner. Case No. 2:00-cv-0706, 2007 WL 4562634 (S.D. Ohio). Like the plaintiffs here, the prisoner in the *Mann* case alleged that his need for congregate worship could not adequately be satisfied by attending general Protestant services. Mr. Mann cited differences in certain religious tenets and the fact that Christian Identity adherents would find the participation of homosexuals and members of minority groups offensive. The district court concluded that Mr. Mann had failed to make an adequate showing that the denial of communal worship substantially burdened the exercise of his faith:

> The primary basis for this conclusion is that Mr. Mann has not identified any other members of that church who are imprisoned at the [same facility] and who would attend such congregate worship service. Further, he has not explained how congregate worship services are either required by his religion or would substantially further his exercise of that religion beyond those things already permitted to him.

*Id.* at *4. This Court finds the *Mann* analysis persuasive.

19

Plaintiffs complaint regarding the seven holy days fairs no better. As discussed above, the issue relating to the celebration of the holy days centers on plaintiffs' interest in participating in communal services under the Christian Identity faith. That interest runs into the same obstacle as the communal weekly celebration of the sabbath. *See Treece v. Burnett*, 2007 WL 2815020, at *6 (W.D. Mich., Sept. 25, 2007) ("While RLUIPA provides certain protections to an inmate's ability to express his religious faith, [it] does not elevate accommodation of religious observances over an institution's need to maintain order and safety."). Plaintiffs have not otherwise met their burden of demonstrating that the nonrecognition of the Christian Identity faith substantially interferes with their ability to observe the holy days.

Finally, as discussed above, plaintiffs cannot demonstrate that the nonrecognition of their faith precludes them from being baptized by total immersion. They have already had such a request approved, and they have offered nothing to suggest that the request would not be approved again if they are located at a prison facility that can accommodate total immersion baptism.

Accordingly, the Court finds for Defendants on Plaintiff's RLUIPA claims.

## **Conclusion**

For the reasons articulated herein, the Court finds for defendant on plaintiffs' First Amendment and RLUIPA claims. A judgment consistent with this opinion will enter in defendant's favor.

Date: March 27, 2019   /s/Phillip J. Green
　　　　　　　　　　　　　PHILLIP J. GREEN
　　　　　　　　　　　　　United States Magistrate Judge

Plaintiffs complaint regarding the seven holy days fairs no better. As discussed above, the issue relating to the celebration of the holy days centers on plaintiffs' interest in participating in communal services under the Christian Identity faith. That interest runs into the same obstacle as the communal weekly celebration of the sabbath. *See Treece v. Burnett*, 2007 WL 2815020, at *6 (W.D. Mich., Sept. 25, 2007) ("While RLUIPA provides certain protections to an inmate's ability to express his religious faith, [it] does not elevate accommodation of religious observances over an institution's need to maintain order and safety."). Plaintiffs have not otherwise met their burden of demonstrating that the nonrecognition of the Christian Identity faith substantially interferes with their ability to observe the holy days.

Finally, as discussed above, plaintiffs cannot demonstrate that the nonrecognition of their faith precludes them from being baptized by total immersion. They have already had such a request approved, and they have offered nothing to suggest that the request would not be approved again if they are located at a prison facility that can accommodate total immersion baptism.

Accordingly, the Court finds for Defendants on Plaintiff's RLUIPA claims.

## **Conclusion**

For the reasons articulated herein, the Court finds for defendant on plaintiffs' First Amendment and RLUIPA claims. A judgment consistent with this opinion will enter in defendant's favor.

Date: March 27, 2019   /s/Phillip J. Green
　　　　　　　　　　　　　PHILLIP J. GREEN
　　　　　　　　　　　　　United States Magistrate Judge