UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES FOX #458647, *et al.*,

    Plaintiffs,

v.

HEIDI WASHINGTON,

    Defendant.

_____/

Hon. Phillip J. Green

Case No. 1:13-cv-01003-PJG

## **MEMORANDUM OPINION**

This is a civil rights action brought by two state prisoners pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq*. Plaintiffs are prisoners James Fox and Scott Perreault. This lawsuit arises out of conditions of their confinement. When this action was filed, both plaintiffs were held at the Richard A. Handlon Correctional Facility. Currently, James Fox is a prisoner at Muskegon Correctional Facility and Scott Perreault is confined at Lakeland Correctional Facility. Heidi Washington is the director of the Michigan Department of Corrections (MDOC). The Court will henceforth refer to Defendant as the MDOC.

Plaintiffs challenge the MDOC's denial of their request to have the Christian Identity faith – their faith – recognized. (Amend. Compl., ECF No. 15). Specifically, they allege that the MDOC has violated the Free Exercise Clause of the First Amendment and RLUIPA by: (1) denying them communal worship; (2) denying

them full-body immersion baptism;[1] and (3) denying them the ability to celebrate seven religious holidays that are recognized by the Christian Identity faith. (*Id.*, PageID.44). Plaintiffs are seeking injunctive relief requiring that the MDOC recognize the Christian Identity faith.

On August 13, 2018, this Court conducted a bench trial. (Minutes, ECF No. 139). Having considered the trial evidence and the parties post-trial briefs, the Court found for the MDOC on both of plaintiffs' claims. (Mem. Op., ECF No. 152). The Court entered judgment (ECF No. 153), and plaintiffs appealed (Notice, ECF No. 154). The Sixth Circuit reversed the decision of this Court regarding the RLUIPA claim, and it remanded the case "for consideration and a ruling on whether the [MDOC] satisfied the standard of strict scrutiny under RLUIPA's third step." *Fox v. Washington*, 949 F.3d 270, 273 (6th Cir. 2020). The Sixth Circuit directed this Court "to take additional evidence as necessary, with the understanding that the [MDOC] will face a heavy burden at this step." *Id.* at 283. The MDOC is limited to relying on the two previously-asserted bases for denying Plaintiffs' request for recognition of the Christian Identity faith. *See id.*

This Court conducted an evidentiary hearing on April 9, 2021, limited to the issues of whether the MDOC's denial of recognition of the Christian Identity faith serves a compelling government interest and whether it is the least restrictive means

---

[1] The baptism issue is now moot, as the parties have stipulated that plaintiffs "have both been provided with full immersion baptisms in accordance with their religious beliefs." (10/18/21 Stip., ECF No. 229).

2

of furthering that compelling interest. (Minutes, ECF No. 216; Hrg Tr. at 3, ECF No. 219, PageID.2009). The MDOC called two witnesses: Todd Bechler, a senior intelligence analyst with the MDOC (Hrg Tr. at 8-41, ECF No. 219, PageID.2014-47); and Steve Adamson, a retired MDOC special activities coordinator (Hrg Tr. at 43-58, PageID.2049-64). The MDOC also offered the deposition of David Leach, a retired MDOC special activities coordinator. (Hrg Tr. at 58-59, PageID.2064-65; 2/8/21 Leach Dep., ECF No. 221). Plaintiffs each testified on their behalf. (Perreault, Hrg Tr. at 60-70, ECF No. 219, PageID.2066-76; Fox, Hrg Tr. at 70-74, PageID.2076-80). The Court has also considered the testimony of the August 13, 2018, bench trial, as well as the parties' post-trial and post evidentiary hearing briefs. (ECF No. 145, 150, 151, 220, 222, 223, and 227).

## Relevant Factual Findings

1.   Evidence Presented During August 13, 2013, Bench Trial

During the August 13, 2013, bench trial, the parties offered the following evidence relevant to the remaining issues, which the Court finds credible.

Plaintiff Scott Perreault testified that he had been a practitioner of the Christian Identity ("CI") faith for 23 years. (Trial Tr. at 19, ECF No. 141, PageID.1155). He believes that there are "two physical seed lines in the earth that are the age-old conflict between good and evil." (*Id.* at PageID.1157). "All of the non-Caucasian races were on Earth before Adam was created. . . . All races were created according to the Law of Kind after his kind and were to remain segregated in the habitat given each of them by the eternal God." (*Id.* at 1174). Mr. Perreault believes

3

that, while Jehovah declared all people good, the races were to remain segregated. (*Id.* at 1174, 1192). The CI faith does not condone violence. (*Id.* at PageID.1175). He acknowledged that the CI faith teaches white separatism. (*Id.* at PageID.1189 (quoting Pltfs' Exh. 20 at ¶ 5)). In fact, racial separatism is a significant tenet of the CI faith. (*Id.* at PageID.1191-92). Non-white persons are prohibited from membership in the CI faith. (*Id.* at PageID.1193).

Mr. Perreault testified that he had a "Negro" cellmate at one time who is a member of the "Five Percent Nations of God on Earth," which is a religion for persons of the "Negro persuasion." (*Id.* at PageID.1176). Although he and this cellmate had differences of views regarding religious matters, their discussions were civil and respectful. (*Id.* at PageID.1176-77).

Kenneth Robinson is an inmate with the MDOC. He testified that he is a member of the Five Percent Nation of Gods on Earth. (Trial Tr. at 62, ECF No. 141, PageID.1198). He once shared a cell with Scott Perreault for a period of four to five months. (*Id.* at PageID.1199). Mr. Robinson engaged in discussions with Mr. Perreault concerning their different religious beliefs. (*Id.* at PageID.1200-01). They got along well. (*Id.*).

Plaintiff James Fox testified that he has been a member of the CI faith since 2012, and he has taken a number of courses regarding the tenets of that religion. (Trial Tr. at 68-69, 81, ECF No. 141, PageID.1204-05, 1217). According to Mr. Fox, the CI faith teaches that "the Anglo-Saxon, Scandinavian and kindred people are God's chosen Israel." (*Id.* at PageID.1205).

4

The CI faith does not promote hatred of other races, nor does it condone violence. (*Id.* at PageID.1206, 1209). The CI faith does teach, however, that the white people are the Israelites of the Bible and that they are called to be the servant people of God. (*Id.* at PageID.1209). The CI faith promotes racial separatism in areas of marriage and worship. (*Id.* at PageID.1210).

David Leach served as the Special Activities Coordinator for the MDOC, the duties of which included reviewing prisoners' requests for recognition of religious groups. (Trial Tr. at 111, ECF No. 141, PageID.1247). He drafted an August 3, 2017, memorandum for MDOC Deputy Director Kenneth McKee in which he recommended denial of Plaintiffs' request for recognition of the CI faith. (*Id.* at PageID.1254 (memorandum introduced as Exhibit A)). Mr. Leach recommended denial of the request based, in part, on the opinion of the Chaplain Advisory Council's opinion that the CI adherent's religious practices could be adequately addressed by other recognized religious groups. (Trial Tr. at 111, 114-18, at PageID.1247, 1250-54). The MDOC has an interest in minimizing the number of religious services offered due to the limits on time and space for conducting such services. (*Id.* at PageID.1252-53).

Mr. Leach also conducted research into the CI faith, and based on that research, he concluded that it had a history of racial violence. (*Id.* at PageID.1256-59 (research materials introduced as Exhibit B)). In his memorandum, Mr. Leach noted the following:

> Furthermore, although it would not factor into whether or not the Christian Identity religion should be recognized as a religious group, the Christian Identity movement is known to have extreme racist and anti-Semitic views with a history of violence in the United States. It is a

5

> movement uniting many of the white supremacist groups in the United States, with the Ku Klux Klan reportedly the largest group within the Christian Identity movement. Interestingly, the Southern Poverty Law Center itself has stated that the Christian Identity movement has 'a unique anti-Semitic and racist theology". For these reasons, the practice of the Christian Identity movement would pose a threat to the custody, and security of our correctional facilities.

(Trial Exh. A).[2]

Kenneth McKee was the Deputy Director for the MDOC with responsibility for overseeing the state's thirty prisons, including the security of those prisons. (Trial Tr. at 97, ECF No. 141, PageID.1233). He testified that the primary benefit of the MDOC's recognition of a religious faith is that the group is allowed to conduct weekly meetings. (*Id.* at PageID.1235). A prisoner who adheres to a non-recognized faith is not prohibited, however, from worshiping as he chooses. (*Id.* at PageID.1235). Mr. McKee made the determination to deny Plaintiffs' request for recognition of the CI faith. He made this decision after reviewing David Leach's recommendation. (*Id.* at PageID.1236). Mr. McKee denied the request, in part, because he accepted Mr. Leach's recommendation that CI adherents' religious needs could adequately be met through other recognized religions. But he was more focused on the risks such recognition would pose to maintaining the security of the prison system. (*Id.* at PageID.1238). His handwritten note of August 7, 2017, documenting his decision states: "I approve that the recognition of this Christian Identity Religious group be denied due to the threat to the custody and security at all correctional facilities."

---

[2] A copy of this memorandum can be found in the record at ECF No. 119-3, PageID.797.

6

(Trial Exh. A). Mr. McKee acknowledged that he relied on the recommendations in Mr. Leach's memorandum, and that he had no independent evidence or basis for his decision. (*Id.* at PageID.1244-45).

    2.    <u>Evidence Presented During April 9, 2021, Evidentiary Hearing</u>

Both parties offered additional evidence during the April 9, 2021, evidentiary hearing. The Court credits the following testimony.

Mr. Bechler, an MDOC senior intelligence analyst, testified that he has a master's degree in homeland security, focusing on domestic terrorism, and that he has significant law enforcement experience concerning gangs and terrorist organizations. (Hrg Tr. at 9-10, ECF No. 219, PageID.2015-16). Mr. Bechler's studies included information about the CI faith. (*Id.* at PageID.2016-17). In 2017, he was asked by the MDOC Deputy Director to opine on the CI faith as a religious group. (*Id.* at PageID.2016). Mr. Bechler noted that the CI faith "tends to be more towards a white supremacist-type of ideological perspective," and that adherents believe that "the Caucasian race is part of the lost tribe of Israel." (*Id.* at PageID.2017). Non-white people are perceived as "mud people or pre-Adamic people, individuals that were not present with God's blessing in the Garden of Eden." (*Id.*).

Mr. Bechler testified that, while the CI faith itself did not advocate violence, leaders of some of white supremacist organizations involved in violence were adherents of that faith. (*Id.* at PageID.2018). Mr. Bechler opined that the CI faith should not be recognized by the MDOC due to the faith's racist teachings. (*Id.*). He explained that recognition of such a religion would likely increase racial tensions in

7

the prison and provoke violence, undermining the MDOC's ability to maintain security and to protect the safety of inmates and staff:

> It is already a tense situation. A prison is a microcosm of society and racial tensions always exist in the prison. And taking a certified step towards that would only worsen existing racial tensions.
>
> ***
>
> All prisoners and all staff are entitled to safe time in our facilities, and part of our mission is to eliminate whatever violence we can through the mechanisms, lawful mechanisms that we have to do so. And minimizing racial tensions would definitely be one of those.

(*Id.* at PageID.2019). Compounding these concerns is the fact that the prison population consists of individuals who have difficulty "following normal social rules." (*Id.* at PageID.2019-20).

In 2017, Steve Adamson was an institutional chaplain with the MDOC, and a member of the Chaplain Advisory Council (CAC). (Hrg Tr. at 43-44, ECF No. 219, PageID.2049-50). As a member of the CAC, he participated in the recommendation against recognition of the CI faith. (*Id.* at PageID.2050-52). Mr. Adamson testified that, pursuant to MDOC policy, any prisoner can join a religious group, regardless of the prisoner's race. (*Id.* at PageID.2053). Accordingly, should the MDOC recognize the CI faith, it could not exclude a non-white prisoner from attending the religious services of that group should the prisoner choose to attend. (*Id.* at PageID.2054).

In 2017, David Leach worked for the MDOC as a special activities coordinator. (2/8/21 Leach Dep. Tr. at 5, ECF No. 221, PageID.2146). He wrote the April 3, 2017, memorandum recommending that the MDOC not recognize the CI faith. (*Id.* at

PageID.2146-47). He conducted research into white supremacist groups around the nation in which he found information indicating that the Southern Poverty Law Center referred to the CI faith as having "a unique anti-Semitic and racist theology," which information he included in his April 3, 2017, memo. (*Id.* at PageID.2148). Mr. Leach confirmed that MDOC policy directive 05.03.150 prohibited the Department from restricting a prisoner from attending the services of a religious group on the basis of race, color or nationality. (*Id.* at PageID.2149). The MDOC had no way of verifying if a prisoner attending a given religious service was actually a member of that religion. (*Id.* at PageID.2150-51).

Scott Perreault testified that he has been incarcerated for some thirteen years. (Hrg Tr. at 61, ECF No. 219, PageID.2067). He has had an African-American cell mate. They got along fine and even became friends. (*Id.*). Mr. Perreault testified that he would not preclude non-white prisoners from attending a CI faith service. He would, however, advise any such person attending that "this service has – have the emphasis on teaching the Caucasian history and heritage, Christian heritage." (*Id.* at PageID.2068). He acknowledged that he did not speak on behalf of other members of the CI faith, but only on his own behalf. (*Id.* at PageID.2070).

James Fox testified that he would allow a non-white prisoner to attend CI faith services, but he would give the non-white prisoner a warning similar to what Mr. Perreault described. (Hrg Tr. at 71, ECF No. 219, PageID.2077). Mr. Fox stated that he sincerely believed that the CI faith was neither violent nor racist. (*Id.* at PageID.2077-78).

9

**Discussion**

Plaintiffs assert that the CI faith requires them to participate in communal worship with racial separatism, to be baptized by full body immersion, and to observe certain religious holy days. (*See* Pltfs' Br. at 20-21, ECF No. 145, PageID.1544-45 (citing Aug. 13, 2018, Trial Tr., ECF No. 141, PageID.1156-57, 1166, 1168, 1169, 1214)). Plaintiffs complain that the lack of recognition precludes them from conducting religious services as proscribed by the CI faith, including their practice of excluding non-whites. (*See* Pltfs' Br. at 21, 23, PageID.1545, 1547).

Defendant MDOC counters that plaintiffs' request for the recognition of the CI faith was denied for two reasons: (1) that "the religious beliefs and practices of the Christian Identity religion can be adequately met by an existing recognized religious group"; and (2) that it would "threat[en] . . . the custody and security at all correctional facilities." (Aug. 13, 2018, Trial Exh. A (Aug. 3, 2017, MDOC Memorandum); K. McKee, Aug. 13, 2018, Trial Tr. at 99-102, ECF No. 141, PageID.1235-38; D. Leach, Aug. 13, 2018, Trial Tr. at 118-19, PageID.1254-55). The decision regarding the adequacy of an existing religious group was based on the recommendation of the Chaplaincy Advisory Council,[3] which opined that "many core religious beliefs of the Christian Identity religion are similar to those of other Christian religious groups recognized by the MDOC." (Aug. 13, 2018, Trial Exh. A).

---

[3] The Chaplaincy Advisory Council consists of members from various religious organizations representing different belief systems. It provides advice and recommendations to the MDOC concerning religious issues. (D. Leach, August 13, 2013, Trial Tr. at 114, ECF No. 141, PageID.1250).

10

## Plaintiffs' RLUIPA Claim

RLUIPA prohibits the MDOC from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). Analysis of Plaintiffs' RLUIPA claim involves three steps: Plaintiffs must first demonstrate that they hold a sincerely held belief in the CI faith; second, Plaintiff's must demonstrate that MDOC's decision denying their request for recognition of the CI faith substantially burdens their exercise of that faith. *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015). Should Plaintiffs meet their burdens as to each of these steps, the burden shifts to the MDOC to show that the denial of recognition of the CI faith serves a compelling government interest and that it is the least restrictive means of achieving that purpose. *Id.* at 362.

The sincerity of Plaintiffs' stated religious beliefs was never in question. The Sixth Circuit has held that Plaintiffs have established the substantial burden MDOC's non-recognition has placed on the exercise of their CI faith. *Fox v. Washington*, 949 F.3d at 279. Accordingly, the only remaining issues are whether the MDOC has met its burden of demonstrating that the denial of recognition of that faith serves a compelling government interest and whether it does so in the least restrictive way.

The MDOC proffers two bases for denying Plaintiffs' request for recognition of the CI faith. The first – that there are other recognized religions that can adequately accommodate the religious needs of CI adherents – warrants little analysis. The

11

Sixth Circuit has already rejected this contention. Moreover, the MDOC has failed to establish that the need to restrict the number of religious services, due to limits on time and space, constitutes a compelling government interest. Much less has the MDOC shown that denial of the CI faith is the least restrictive means of furthering that interest.

The analysis of the second basis – that recognition of the CI faith would threaten the custody and security of MDOC prison facilities – must begin with an undisputed fact: the CI faith is an "explicitly racist" religion. *Fox v. Washington*, 949 F.3d at 273. As both Plaintiffs concede, an integral tenet of that religion is the segregation of the races, and the belief that the white race alone comprises the descendants of the Israelites – the chosen people of God. *See id.* at 274.

Mr. Bechler, a senior intelligence analyst for the MDOC, testified to the attendant risks of prison violence associated with any form of racism. He explained that recognition of the CI faith would likely increase racial tensions in the prison and provoke violence. This, in turn, would undermine the MDOC's ability to maintain security and to protect the safety of inmates and staff. (*See* Hrg Tr. at 12-13, ECF No. 219, PageID.2019). Compounding these concerns is the fact that the prison population consists of individuals who have difficulty "following normal social rules." (*Id.* at PageID.2019-20).[4]

---

[4] Plaintiffs challenge the credibility and persuasiveness of Mr. Belcher's testimony. But assessing and weighing the evidence, as well as assessing the credibility of the witnesses, falls within the Court's purview. The Court, as already noted, finds Mr. Belcher's testimony and evidence credible and persuasive.

That the MDOC has a compelling interest in maintaining prison security is beyond debate. *See Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005) ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."); *see also Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (The legitimacy of the government's interest in prison security is "beyond question."); *Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.").[5] The Sixth Circuit explicitly held, in the context of a RLUIPA claim, that " 'prison security is a compelling state interest' and 'deference is due to institutional officials' expertise in this area.' " *Hayes v. Tennessee*, 424 F. App'x 546, 554 (6th Cir. 2011) (quoting *Cutter*, 544 U.S. at 725 n.13).

With respect to whether denial of recognition of the CI faith serves a compelling interest in the least restrictive way, the Sixth Circuit has counseled against second-guessing prison officials. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2006). "The Supreme Court has held that, in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)); *see also Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (issues

---

[5] *Thornburgh* and *Pell* are First Amendment cases.

involving prison administration are properly resolved by prison officials, and the solutions at which they arrive should be afforded deference). In enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson*, 544 U.S. at 723 (quoting S. Rep. No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900)).

If the history of mankind teaches anything, it is that racism or a belief in racial separatism or superiority increases the likelihood of violence and social unrest. As Mr. Bechler testified, the likelihood of such racially motivated unrest and violence is increased in the prison setting. Thus, the risk posed by requiring the MDOC to formally recognize a religion the Sixth Circuit has already held is "explicitly racist" is manifest. Formal recognition of the CI faith would undermine institutional security, imperil the safety of prisoners and prison staff, and significantly increase the likelihood of racially motivated violence and disruption.

The Court accepts Plaintiffs' testimony that they, themselves, are nonviolent, and that they do not condone violence. But these contentions miss the point. In preserving prison security, the MDOC is not limited to thwarting individuals who condone or engage in violence. The MDOC also has a compelling interest in creating within its prisons an environment that minimizes the likelihood of violence and disruption and ensures the safety and well-being of staff and inmates.

Plaintiffs implicitly acknowledge the very real risk that formal recognition of their faith would foster an environment that appreciably increases the likelihood of racially motivated violence and disruption. As Plaintiffs testified, while they would not act to prevent a non-white prisoner from attending a CI faith service, they would nevertheless find it necessary to warn any such prisoner of what the CI faith teaches. In this regard, Plaintiffs testified that the CI faith teaches white separatism and that its adherents are "God's chosen Israel." Thus, even accepting that Plaintiffs do not believe in violence, they seek recognition of a faith, which, by their own testimony, teaches white superiority and separatism. Stated differently, Plaintiffs seek formal recognition of a faith that believes and promotes beliefs regarding race and ethnicity that, by their own admission, require an explicit warning to non-adherents. Moreover, as previously noted, neither CI adherents nor the MDOC could prohibit non-whites from attending CI religious services. (*See* Adamson 4/27/21 Hrg Tr. at 47-48, ECF No. 219, PageID.2053-54; 2/8/21 Leach Dep. Tr. at 7, ECF No. 221, PageID.2149). That such a circumstance is a recipe (if not an outright guarantee) for racially motivated disruption and violence is obvious and cannot reasonably be disputed.

Accordingly, the Court finds that formal recognition of the CI faith would undermine institutional security, imperil the safety of prisoners and prison staff, and significantly increase the likelihood of racially motivated violence and disruption. The Court further finds that the MDOC has a compelling state interest in preventing such.

15

Having reached this conclusion, the question becomes whether denying formal recognition of the CI faith constitutes the least restrictive means of furthering this compelling state interest. In this respect, it is important to remember that the question is not whether Plaintiffs can be members of the CI faith, but rather, whether the MDOC must be compelled to formally recognize the CI faith and permit group worship by its members. Formal recognition of a faith group is a binary question. Just as "there is no such thing as being just a little bit pregnant," *Mason v. Pulliam*, 402 F. Supp. 978, 982 (N.D. Ga. 1975), there is, at least not on the present record, any possibility of recognizing the CI faith "just a little bit." The MDOC either extends formal recognition to the CI faith and permits group worship or it does not. Thus, the Court finds that declining to formally recognize the CI faith is the least restrictive means of furthering the MDOC's compelling state interest in maintaining institutional security, ensuring the safety of prisoners and prison staff, and preventing racially motivated violence and disruption.

## Conclusion

In conclusion, the Court finds that the MDOC has satisfied its burden of demonstrating that denying formal recognition of the CI faith furthers a compelling governmental interest in maintaining institutional security, ensuring the safety of prisoners and prison staff, and preventing racially motivated violence and disruption. The Court further finds that there is no less restrictive means of furthering that compelling interest.

Accordingly, a judgment in favor of Defendant will issue.

Date: October 29, 2021                    /s/Phillip J. Green
                                          PHILLIP J. GREEN
                                          United States Magistrate Judge